LEWIS L. CULLEY AND MINNIE BELLE CULLEY, ET AL.,[1] PETITIONERS,
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 52840, 57860, 57861, 57889, 58991. Filed February 28, 1958.

*Warren V. Ludlam, Jr., Esq.*, for the petitioners.
*R. B. Wallace, Esq.*, for the respondent.

MULRONEY, *Judge:* Respondent determined deficiencies in income tax and additions to tax as follows:

| Year | Petitioner | Docket No. | Deficiency | Addition to tax under sec. 294 (d) |
|---|---|---|---|---|
| 1948 | Lewis L. Culley and Minnie Belle Culley | 52840 | $9,864.36 | |
| 1949 | Lewis L. Culley and Minnie Belle Culley | 57861 | 6,118.12 | |
| 1950 | Lewis L. Culley and Minnie Belle Culley | 57861 | 7,483.66 | $1,220.41 |
| 1951 | Lewis L. Culley and Minnie Belle Culley | 58991 | 1,212.88 | 402.62 |
| 1950 | Harry R. Blair and Grace Brownlee Blair | 57860 | 24.39 | |
| 1950 | Hugh J. McInnis and Kathryn H. McInnis | 57889 | 1,675.64 | |

Petitioner Culley has conceded certain adjustments in his income made by the respondent for the years here involved, which concessions will be given effect in the Rule 50 computation. Respondent concedes error (1) in increasing Culley's income for 1951 in the sum of $454.32; and (2) in determining additions to tax under section 294 (d) (1) (A) and (d) (2) of the 1939 Internal Revenue Code [2] for Culley in the years 1950 and 1951.

The issues presented in these dockets, consolidated for trial, are (1) whether Culley realized ordinary income from the sale of 28 acres of land by the partnership of Culley and Alexander measured by the difference between the cost of such land to him and the amount

---

[1] The following proceedings are consolidated herewith: Harry R. Blair and Grace Brownlee Blair, Docket No. 57860; Lewis L. Culley and Minnie Belle Culley, Docket No. 57861; Hugh J. McInnis and Kathryn H. McInnis, Docket No. 57889; and Lewis L. Culley and Minnie Belle Culley, Docket No. 58991.

[2] All references to section numbers will be to the Internal Revenue Code of 1939, as amended, unless otherwise specified.

credited to his account upon his contribution of such land to the partnership; (2) whether certain sums advanced by Culley to the Meadowbrook Water Corporation were capital contributions or loans; (3) whether certain sums advanced by Culley to King & Company, Inc., were capital contributions or loans; (4) whether certain sums advanced by Culley to Ins-Cem Building & Materials Company, Inc., were capital contributions or loans; (5) whether certain sums advanced by Culley, Blair, and McInnis to the Colonial Country Club, Inc., were capital contributions or loans; (6) if any such advances made by the petitioners to the several corporations were loans and not capital contributions, whether such loans constituted business debts and were therefore deductible, when worthless, under section 23 (k) (1), or whether such loans constituted nonbusiness debts and were therefore deductible under section 23 (k) (4); and (7) whether the income realized by Culley from the sale of 41 lots in the years 1948 through 1951 is taxable as ordinary income or as gain from the sale of capital assets held for more than 6 months.

## FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

Lewis L. Culley and Minnie Belle Culley, husband and wife, are residents of Jackson, Mississippi. They filed joint Federal income tax returns for the years 1948, 1949, 1950, and 1951 with the then collector of internal revenue for the district of Mississippi, at Jackson, Mississippi. Harry R. Blair and Grace Brownlee Blair, husband and wife, are residents of Jackson, Mississippi. They filed a joint Federal income tax return for the year 1950 with the then collector of internal revenue for the district of Mississippi, at Jackson, Mississippi. Hugh J. McInnis and Kathryn H. McInnis, husband and wife, are residents of Jackson, Mississippi. They filed a joint Federal income tax return for the year 1950 with the then collector of internal revenue for the district of Mississippi, at Jackson, Mississippi. All of the petitioners in the dockets before us are on the cash receipts and disbursements basis.

### Culley and Alexander.

The general partnership known as Culley and Alexander was formed in 1945 by Lewis L. Culley and E. B. Alexander, by oral agreement, to develop unimproved real property into residential lots and to sell such residential lots. They agreed to share the profits of the partnership on a 50–50 basis. In 1945 the partnership acquired a tract of land which was developed into the Jackson Belvedere Subdivision, a residential lots development, and in 1946 the partnership acquired an adjoining tract which was used to extend the Jackson Belvedere Subdivision.

In 1944 Lewis L. Culley purchased 28 acres of land at $350 per acre, or a total cost of $9,800, which he contributed in January 1947 to Culley and Alexander for the formation of the East Broadmoor Subdivision, Parts I and II, a residential lots development. The books of the partnership were at all times kept on an accrual basis, and they show that Culley's land was accepted by the partnership at a price of $28,000. Upon the contribution of this property, Culley's capital account on the partnership books was credited in 1947 with the amount of $28,000, representing 28 acres at $1,000 per acre, and an account entitled "Cost of Broadmoor Lots—Land" was debited with the same amount. In January 1947, E. B. Alexander contributed 20 acres of land adjoining Culley's 28 acres to Culley and Alexander for the formation of East Broadmoor Subdivision, Parts I and II. Alexander had purchased this land for $1,000 per acre. In the partnership books, Alexander's capital account was credited in 1947 with the amount of $20,000, and the account "Cost of Broadmoor Lots—Land" was debited with the same amount. The partnership formed the real estate subdivision East Broadmoor, Parts I and II, from these 2 tracts, consisting of 152 lots. Land and development costs were prorated equally over these lots. The partnership sold 14 lots in 1947 from the East Broadmoor subdivision. In 1948 the partnership sold 99 lots from the same subdivision. The total development cost of the 99 lots sold in 1948, exclusive of land costs, was $213.46. In 1949, 32 lots were sold, leaving 7 lots in East Broadmoor I and II, which were subdivided into 30 lots.

Out of the 99 lots sold in 1948 by the partnership, 53 were sold for $43,604 in cash and 46 were sold for $39,100 on the installment basis. In the installment sales the partnership received cash of $4,600. The cost basis of each of the lots sold was determined by the partnership as $529.25, which was based upon a total book value of $73,036.80. Included in the total book value of the lots in each of the years here involved were the amounts of $28,000 and $20,000, which represented the amounts credited to the capital accounts of Culley and Alexander, respectively, when each made his contribution of land to the partnership. Profit on the 32 lots sold by the partnership in 1949 was computed on the basis of a book value of $965.02 per lot. In 1949 the partnership collected $32,250 from the sale of 46 lots made on the installment basis in 1948. In 1950 the partnership sold 30 lots from East Broadmoor I and II, and the profit on these sales was computed on the basis of a book value of $811.73. In 1950 the partnership collected $2,250 from the installment sales of the 46 lots in 1948.

The partnership reported gains from the sale of the above lots using the figures $28,000 and $20,000 in computing costs. Respondent determined a substantial increase in the partnership income distributable to Culley in each of the years involved.

## Meadowbrook Water Corporation.

Meadowbrook Water Corporation (hereinafter called Meadowbrook), a corporation organized under the laws of Mississippi in 1940, was organized by Lewis L. Culley to supply water by underground pipelines from wells to a residential area which was then north of and outside the Jackson, Mississippi, corporate limits. The authorized capital of the corporation was 5,000 shares of common stock with a par value of $1. Meadowbrook issued 3,213 shares of its stock in 1940 to Culley, who at all times was the sole owner of stock in Meadowbrook until it ceased its business operations on May 31, 1948. Culley was president and a director of Meadowbrook during its entire existence. In 1940, Culley transferred the following items, totaling $3,338, to Meadowbrook: Cost of water well No. 1, $1,800; cost of water well No. 2, $1,000; cost of pipeline, $500; and payment of expenses for light and power, $38. In the years 1941 through 1948 Culley paid for the benefit of Meadowbrook the amount of $12,029.34, made up of the following items: Power and lights, $1,922.76; repairs, $3,660.20; taxes, $203.67; capital additions, $5,729.08; fees and commissions, $141.75; auditing expenses, $25; supplies, $6.75; labor $101.55; and miscellaneous expenses, $238.58. Culley recorded his advances to Meadowbrook in his general ledger under the heading "Stock Meadowbrook Water Corp." No promissory notes or other evidences of indebtedness were issued to Culley by Meadowbrook. No person other than Culley ever transferred money or property to Meadowbrook, except for purchasers of water from the corporation. During the same period, 1941–1948, Culley collected the amount of $8,841.66 from Meadowbrook customers and deposited it in his personal bank account. During the years 1945 through 1948 Meadowbrook reported the following net losses in its corporate income tax returns:

| | |
|---|---|
| 1945 | ($553. 89) |
| 1946 | ( 370. 06) |
| 1947 | ( 653. 53) |
| 1948 | ( 136. 88) |

When Meadowbrook was dissolved by Culley in 1948, the city of Jackson extended its water lines to Meadowbrook's vicinity. Its salvageable assets had a fair market value of $1,274.55. In the joint return filed by Culley with his wife in 1948 he claimed an ordinary loss deduction of $5,251.13. Respondent determined that Culley incurred a long-term capital loss on the stock of Meadowbrook of $2,625.57.

## King & Company, Inc.

King & Company, Inc., a corporation organized under the laws of Mississippi in September 1946, was formed by Lewis L. Culley, A. G.

Jones, and John King to acquire and exercise a franchise to make and sell a patented lightweight cement called "Ins-Cem." The authorized capital of the corporation was $15,000, composed of 150 shares of common stock with a par value of $100. Culley, King, and Jones were the sole owners of the stock in the corporation. Culley was president and director of the corporation from September 1946 to September 1948. At the time of the organization of the corporation in 1946, 50 shares were issued to each of the three incorporators. In addition to the initial investment of $5,000, Culley advanced the total amount of $3,509.95 to or for the benefit of the corporation at various times during the years 1946, 1947, and 1948, and during this same period recovered $645.57. The corporation was dissolved on September 30, 1948, and Culley received in liquidation, assets in the amount of $2,864.38, which means he recovered the full amount of his advancement. Jones at various times advanced the total amount of $2,350 to or for the benefit of the corporation, in addition to his original investment of $5,000, and recovered no part of this amount. Jones received nothing when the corporation was dissolved in 1948. King at various times advanced the total amount of $6,712.88 to or for the benefit of the corporation, in addition to his original investment of $5,000. In 1947 a note receivable in the amount of $3,468.47 was assigned by the corporation to King, and in 1948 the corporation paid bills amounting to $245 for King. When the corporation was liquidated in 1948 King did not receive any distribution in liquidation.

Respondent determined that he was entitled to a long-term capital loss in the amount of $2,467.10. Culley took no deductions on account of the above transactions in his 1948 income tax return.

## Ins-Cem Building & Materials Company, Inc.

Ins-Cem Building & Materials Company, Inc. (hereinafter called Ins-Cem), a corporation organized under the laws of the State of Mississippi on November 1, 1948, was formed by Lewis L. Culley, W. J. Castanedo, and L. L. Geiger to manufacture a lightweight building material and to build houses. The authorized capital of Ins-Cem was $10,000, consisting of 10,000 shares of common stock with a par value of $1 per share. Ins-Cem was the successor to a partnership, the Ins-Cem Building & Material Company, whose partners were the three incorporators of Ins-Cem. Culley, Castanedo, and Geiger were the sole owners of stock in Ins-Cem from its organization until it ceased its business operations. At the time of its incorporation in 1948 Ins-Cem issued 3,333⅓ shares of stock to each of the three incorporators. Culley's partnership interest in the predecessor partnership had a basis of $4,575.66 immediately prior to the formation of Ins-Cem. This partnership interest was transferred by

Culley to Ins-Cem upon its organization. Culley advanced a total of $14,839.90 to or for the benefit of Ins-Cem through December 31, 1949, of which $4,575.66 represented the basis of his partnership interest. During this same period Culley received a total of $1,246.68, reducing the net advances to $13,593.22. In 1950 Culley advanced a total of $2,984.46 for the benefit of Ins-Cem and received $250, making the net advances for 1950 a total of $2,734.46. Ins-Cem did not issue notes or other evidences of indebtedness to Culley for the amounts advanced by him. The basis of the partnership interests of Castanedo and Geiger in the predecessor partnership was each $4,388.30. When Ins-Cem was organized in 1948, each of the partners transferred his interest to the corporation, designating $3,333.33 as capital stock and $1,054.97 as paid-in surplus. It was agreed upon the organization of Ins-Cem that Castanedo and Geiger were to perform the services necessary for the operation of the corporation and that Culley would advance the necessary funds for the current operation of the business. In his 1949 and 1950 Federal income tax returns Culley claimed deductions for business bad debts for amounts advanced to Ins-Cem in the amounts of $10,922.05 and $4,309.46, respectively, which were disallowed by the respondent. Ins-Cem was liquidated in 1951. The respondent allowed Culley a long-term capital loss from worthless stock in Ins-Cem for the year 1951 in the amount of $15,500.47.

### Colonial Country Club, Inc.

In 1944 Lewis L. Culley, Harry R. Blair, Hugh J. McInnis, R. A. Ort, and W. H. Hughes formed a partnership called the Colonial Country Club, with each partner making a contribution of $2,000. The purpose of the partnership was to develop certain tracts of land into a residential subdivision and, as an indispensable part of the project, to develop a country club in the same general area. The real estate subdivision was called the Club Park Subdivision. The first lots, approximately 60, were sold from Club Park in 1946, and in addition, the partnership transferred 3 lots to each of the parties.

The partnership originally planned to finance the entire project through the sale of first mortgage notes, with a face value of $1,000 and bearing interest at 4½ per cent, with each noteholder given a 2-year option to purchase Club Park Subdivision lots at a given price. Payments on the mortgage notes were to apply against the purchase price of the lots and each noteholder received a charter membership in the country club. An adverse Treasury Department ruling, treating the money paid for the mortgage notes as an initiation fee and taxable as such, made it impossible to continue this method of financing. The partnership resorted to short-term financing to redeem the 87 outstanding interim certificates issued under the mortgage plan. At various times the predecessor partnership and Colonial Country

Club, Inc., hereinafter called Colonial, were compelled to borrow funds, usually on a short-term basis and with personal endorsements by the parties.

In December 1946 the country club was opened and in January 1947 a golf course, constructed at a cost of approximately $48,500, was completed for the club members. In 1947 the partnership completed a swimming pool and tennis court at a cost of approximately $40,000. Culley, Blair, and McInnis bought out the interests of Ort and Hughes prior to August 1, 1947, on which date the three remaining partners formed a corporation, Colonial Country Club, Inc. All the assets and liabilities of the partnership were transferred to Colonial. In 1947 Colonial borrowed $26,000 from the Deposit Guaranty Bank & Trust Co. and in 1948 it borrowed an additional $65,000 from the Standard Life Insurance Company. Difficulties arose with the members of the country club, and on January 27, 1949, Culley, Blair, and McInnis, sole stockholders of Colonial, as part of a plan to transfer the country club and its facilities to the members, entered into a contract with the trustees for the membership of the country club in which they agreed to sell their stock in Colonial to the trustees. Under the contract the trustees were to operate the club from February 1, 1949, until the final transfer of the stock, which took place on October 6, 1950. The contract specified a purchase price of $190,000, against which $60,000 was credited for the amount the members of the club had previously paid to Colonial, $100,000 was to be in the form of a new bond issue to pay outstanding obligations of Colonial, and $30,000 to be held by the trustees for the payment of other debts of Colonial, with the remaining balance of such $30,000 to be paid to Culley, Blair, and McInnis upon the final transfer of the stock. On October 6, 1950, Culley, Blair, and McInnis transferred their stock in Colonial to the trustees. In return for this transfer they received assets in the amount of $40,913.64, which included residential lots and other land with a cost basis of $18,980.73, and they assumed liabilities of Colonial in the amount of $49,192.44. Culley, Blair, and McInnis had made advances to Colonial and the predecessor partnership in the net amount of $30,137.03, so that the loss realized by them in 1950 amounted to $38,415.83 ($79,329.47 less $40,913.64). Culley's share of the loss was $12,949.88, Blair's, $13,080.58, and McInnis's, $12,385.37.

The books of the predecessor partnership carried all the advances made by the parties in the following ledger accounts:

Lewis L. Culley_____ Investment
Harry Blair_____ Investment
Hugh McInnis_____ Investment

Colonial maintained these same accounts with the notation "Paid In Surplus" added to each account. Several amounts advanced by Cul-

ley, Blair, and McInnis during the year 1945 were designated as loans. No notes or other evidences of indebtedness were issued to Culley, Blair, and McInnis for these various advances either by the partnership or by Colonial. A summary of the advances and recoveries made to the predecessor partnership and to Colonial is as follows:

| ADVANCES TO PARTNERSHIP | | | |
|---|---|---|---|
| | Culley | Blair | McInnis |
| Total advances | $16, 650. 00 | $17, 683. 00 | $17, 433. 00 |
| Less amounts recovered | 7, 306. 45 | 8, 212. 02 | 8, 043. 65 |
| Net advances | 9, 343. 55 | 9, 470. 98 | 9, 389. 35 |
| ADVANCES AFTER INCORPORATION | | | |
| Total advances | 846. 73 | 850. 00 | 236. 42 |
| Recoveries | | | |
| Net advances to partnership and to Colonial | 10, 190. 28 | 10, 320. 98 | 9, 625. 77 |

The advances made by Culley to Meadowbrook, King & Company, Inc., Ins-Cem, and Colonial Country Club, and the advances made by Culley, Blair, and McInnis to Colonial Country Club were contributions to capital and not loans.

### *Sale of Lots by Lewis L. Culley.*

During the years 1948, 1949, 1950, and 1951 Lewis L. Culley, individually, realized gain from the sale of 41 lots, situated in several different tracts of land but in the general area of his home, which he reported on his Federal income tax returns as gain from the sale of a capital asset. These lots came from the Meadowridge Subdivision (7), the Choctaw Park Tract (8), the Culley-Jones tract (1), the Crane tract (1), the Homestead parcel (9), the Culley-Blair tract (3), and miscellaneous parcels of land (12). Included in these miscellaneous parcels of land were tracts known as Club Park, Jackson Belvedere, and a tract acquired by Lewis L. and Minnie Belle Culley in acreage in 1943 (one-half interest) and 1950 (remainder one-half interest).

Meadowridge Subdivision, consisting of a 15-acre tract, was acquired in 1941 in the name of Minnie Belle Culley as a subdivision of 32 lots which had previously been subdivided by Mrs. C. V. Culley. The Choctaw Park tract, purchased in 1940 and 1943 by Culley, was never subdivided, but all sales made from this tract were made by metes and bounds description. The Crane tract, purchased by Culley in 1940, was never subdivided, and all sales of lots were made by metes and bounds description. The Homestead tract was purchased in 1938 by Culley, with an adjoining 5-acre tract (Homestead Addition tract) purchased by Culley in 1940. Both parcels were vacant,

.. 

unimproved acreage when purchased, and all sales made from these tracts were by metes and bounds descriptions. Neither of the two parcels was ever subdivided of record by Culley. The Culley-Blair tract was purchased in 1944 by Lewis L. Culley and Harry Blair, and subsequently Culley obtained Blair's one-half interest. The tract was vacant and unimproved acreage when purchased by Culley and Blair, and it was never subdivided of record. All sales from this tract were made by metes and bounds description. The tract purchased by Culley in 1943 (one-half of the acreage) and 1950 (the remaining one-half) was never subdivided of record, and all sales were made by metes and bounds description. The Club Park Subdivision was the acreage developed by the Colonial Country Club, Inc., and its predecessor partnership.

Culley did not advertise or list for sale the properties, except for Club Park, from which the 41 lots were sold. During the years 1948 through 1951 Culley was a member of the partnership Culley and Alexander, whose business was subdividing and selling real estate, and during the years 1949 through 1951 Culley was a member of the partnership Culley and Jones, which was also engaged in the real estate business. No distinction was made on the books and records of Culley in the properties held by him. During the years 1949 through 1951 Culley maintained an office with his brother-in-law, R. J. Arnold. On the office door appeared the name "R. J. (Pete) Arnold" and beneath that the words "Real Estate." Beneath that appeared the name "Lewis L. Culley." Gains realized from the sales of residential lots by the two partnerships during the period 1948 through 1951, as well as gains realized by Culley, individually, through the construction and sale of houses, were reported as ordinary income. During the period 1946 through 1951 Culley sold 797 residential lots, either individually or as a partner in real estate partnerships. These sales were as follows:

| Year | Houses sold individually and reported as ordinary income | Lots sold individually and reported as capital gain | Lots sold individually and reported as ordinary income | Lots sold through partnerships and reported as ordinary income |
|---|---|---|---|---|
| 1946 |  | 2 |  | 131 |
| 1947 | 3 | 16 |  | 98 |
| 1948 | 5 | 16 |  | 113 |
| 1949 | 5 | 13 |  | 126 |
| 1950 |  | 9 | 67 | 119 |
| 1951 |  | 3 | 44 | 27 |
| Total | 13 | 59 | 111 | 614 |

During the years 1946 through 1949 Culley purchased, either individually or through his two real estate partnerships, 18 parcels of land at a cost of $167,691.98. These purchases were as follows:

| Year | Individually | | Through partnership | |
|---|---|---|---|---|
| | Number | Cost | Number | Cost |
| 1946 | 2 | $1,000.00 | 1 | $59,100.00 |
| 1947 | | | 1 | 22,970.43 |
| 1948 | 7 | 8,819.65 | | |
| 1949 | 7 | 75,801.90 | | |

During the years 1948 through 1951 the sales made by Culley through the partnership of Culley and Alexander were from the following subdivisions: East Broadmoor, Fontaine Park, Jackson Belvedere, Lake Catherine, and Northview Addition. During the years 1949 through 1951 Culley sold real estate through the Culley-Jones partnership out of the Culley-Jones tract.

Culley made the following expenditures for the development of tracts in which he had an individual interest: Approximately $500 on the Meadowridge Subdivision for sewerage, street drainage, and the planting of trees; approximately $1,900 on the Choctaw tract for paving and sewers; approximately $8,000 on the Homestead tract for sewers, dirt, street repairs, dirt fill, pool, brick walks, and shrubs, and approximately $1,000 on the Culley-Blair tract for paving, survey, and street repairs.

In July 1954 Culley made a sworn application for a broker's license to the Mississippi Real Estate Commission in which he stated that his business was developing subdivisions and building homes for sale since 1930.

The 41 residential lots were held by Culley for sale to customers in the ordinary course of his trade or business.

During the years 1948 through 1951, Culley was an officer and/or director of the following corporations:

| Corporations | Officer or directorship | Date |
|---|---|---|
| Meadowbrook Water Corporation | President and director | May 25, 1940–May 31, 1948. |
| King & Company, Inc | President and director | Sept. 16, 1946–Sept. 30, 1948. |
| Ins-Cem Building & Materials Company, Inc | Vice president and director | Nov. 1, 1948–Oct. 31, 1951. |
| Colonial Country Club, Inc | President and director | Aug. 1, 1947–Oct. 6, 1950. |
| Club Park Water Co., Inc | President and director | June 18, 1950–1952. |
| Garden Memorial Park Cemetery, Inc | President and director | Sept. 1950–1953. |
| Thrift Savings & Loan Association, Inc | President and director | 1942–1948. |

## OPINION.

1. The first issue concerns the Culley and Alexander partnership. It is conceded the partnership agreement was that Culley and Alexander share equally in profits and losses. In 1947 Culley contributed 28 acres of land which was accepted by the partnership at $28,000, in which Culley had a cost basis of $9,800. The land was carried on

the partnership books at $28,000 and, when lots from this tract were sold, the partnership reported distributable income using a cost basis figure of $28,000. Most of the lots in the transferred tract were sold during the years involved here.

In respondent's determination of deficiency there is one item which is a substantial increase of the partnership income distributable to Culley during the years involved, over the income which was reported in the partnership returns as distributable to Culley. Upon brief respondent states: "Neither the partnership nor partner Culley have ever reported or paid taxes upon the difference between partner Culley's cost basis of $9,800.00 and the price of $28,000.00 credited to the partnership books at the time of the contribution. The Commissioner determined that this difference was taxable to Culley as ordinary income."

Culley seems to argue that this difference between $9,800 and $28,000, if taxable at all, would be taxable as capital gain in the year he transferred the 28 acres to the partnership.

Both parties are wrong. Petitioner realized no capital gain on his transfer of the 28 acres to the partnership. *Helvering* v. *Walbridge*, 70 F. 2d 683, affirming a Memorandum Opinion of this Court. But that does not mean the difference between the $28,000, the price at which the tract was accepted by the partnership, and $9,800, the cost of the tract to Culley, is taxable to him as ordinary income, which respondent states was the Commissioner's determination.

The basis to the partnership for the determination of profit on the sale of the lots in the transferred tract was that of Culley or $9,800. Sec. 113 (a) (13), I. R. C. 1939, Regs. 111, sec. 29.113 (a) (13)-1. The cited regulation provides in part:

The basis of property contributed in kind by a partner to partnership capital after February 28, 1913, is the cost or other basis thereof to the contributing partner. * * *

Under the cited statute and regulation, and pursuant to the partnership agreement of an equal partnership, Culley's true distributable income from the partnership was one-half of the profit from the sale of the lots in the transferred tract, computed on the basis of the cost of the tract at $9,800 and not $28,000. Sec. 182 (c), I. R. C. 1939. We so hold.

2. We must next decide whether certain losses suffered by Culley in connection with the Meadowbrook Water Corporation, King & Company, Inc., and Ins-Cem Building & Materials Company, Inc., and losses by Culley, Blair, and McInnis in connection with the Colonial Country Club were ordinary losses or capital losses. It is the position of the petitioners that their respective advances made to the corporations over the years were loans and that consequently

the losses are deductible as business bad debts under section 23 (k) (1) or, in the alternative, as losses in a transaction entered into for profit within the meaning of section 23 (e) (2). It is the contention of the respondent that these advances to the corporations were capital contributions and that the losses encountered are deductible only under section 23 (g), with the limitations therein contained. In the alternative, respondent makes the argument that even if the advances by the petitioners to the corporations in fact created bona fide debts, that such debts were nonbusiness debts and only deductible under section 23 (k) (4).

Whether or not the advances to the corporations here in question were capital contributions or loans is a question of fact, and in seeking the answer to such question the true intent of the parties is relevant.

The facts with respect to the advancements made to corporations in the instant cases are very similar to the facts in a number of cases where we held advances made to newly organized corporations were capital contributions and not debts. *Edward G. Janeway*, 2 T. C. 197, affd. 147 F. 2d 602; *Sam Schnitzer*, 13 T. C. 43, affd. 183 F. 2d 70, certiorari denied 340 U. S. 911; *Isidor Dobkin*, 15 T. C. 31, affirmed per curiam 192 F. 2d 392; *Hilbert L. Bair*, 16 T. C. 90; *Phil Kalech*, 23 T. C. 672; *Colony, Inc.*, 26 T. C. 30, affd. 244 F. 2d 75, certiorari granted 355 U. S. 811.

Meadowbrook Water Corporation was organized in 1940 with Culley as sole stockholder throughout its existence. Upon the formation of Meadowbrook, Culley advanced to the corporation the amount of $3,338, which included $1,800 for the cost of water well, $1,000 as part of the cost of a second water well, $500 for the cost of a pipeline, and $38 expenses for power and light. During the years 1941 through 1948 Culley made a series of advances to the corporation in the sum of $12,029.34 for repairs, taxes, power and light expenses, capital additions, fees and commissions, auditing expenses, supplies, labor, and miscellaneous expenses. During this same period Culley received from the sale of water by the corporation the amount of $8,841.66, which sum was collected from the customers and deposited directly in Culley's personal bank account. When the corporation was liquidated in 1948 Culley received assets in the amount of $1,274.55. We agree with the respondent that the amounts advanced by Culley over the existence of the corporation were capital contributions and that the loss resulting from the corporation's liquidation was a capital loss. Meadowbrook was operated on an extremely informal basis, with payments by customers going directly to Culley. No notes or other evidences of indebtedness were ever issued by the corporation. An examination of the nature of the initial investment in 1940 shows clearly that the cor-

poration was undercapitalized. Culley was compelled from the start to make advances to meet the current operating expenses of the corporation. In the years 1945 through 1948, the corporation showed losses in each year. Under these circumstances Culley could not have entertained much hope for repayment. We cannot find from the record that Culley ever intended to establish a bona fide debt relationship with the corporation.

Ins-Cem Building & Materials Company, Inc., was incorporated on November 1, 1948, and it was dissolved in 1951. The purpose of the corporation was to manufacture a lightweight building material and to build houses. Upon the formation of the corporation, Culley, Castanedo, and Geiger were each issued 3,333⅓ shares of stock by the corporation. The corporation was the successor to a partnership whose partners were the three incorporators of Ins-Cem. Culley's interest in the partnership had a basis of $4,575.66 immediately prior to the formation of Ins-Cem and this interest was transferred by Culley to the corporation. It was agreed upon the organization of Ins-Cem that Castanedo and Geiger were to perform the services necessary for the successful operation of the corporation and that Culley would advance the necessary funds. In this instance it appears to us that the advancements made by Culley cannot properly be regarded as loans.

The only difference with respect to the advancements made here and the advancements made by Culley to other corporations is that Culley's advancement was disproportionate to his stockhoding, i. e., he advanced all of the working capital and the other two stockholders advanced nothing. The fact was present in *Phil Kalech*, *supra*, and *Colony*, *Inc.*, *supra*, where we held the advancements were contributions to capital. The other factors present such as the fact that there were no notes or other evidence of indebtedness and the funds were advanced to a newly organized corporation, which lacked any liquid capital, in order to get the business established and keep it in operation, show the advancements amount to a contribution to capital.

In 1944 Culley, Blair, McInnis, Ort, and Hughes formed a partnership to develop certain tracts of land into a residential subdivision and to develop a country club in the same general area. Each of the partners contributed $2,000. In 1946 the country club was opened, and in 1947 a golf course was completed at a cost of approximately $48,500. In 1947 the partnership completed a swimming pool and tennis court at a cost of approximately $40,000. Culley, Blair, and McInnis bought out the other two partners and in August 1947 formed a corporation, transferring to it all the assets and liabilities of the partnership. The partnership, and later the

corporation, was plagued with financial difficulties. It was necessary to carry on operations with short-term financing from a bank, an insurance company, and from an individual lender. Prior to incorporation the petitioners made the following advances to the partnership:

|  | Culley | Blair | McInnis |
|---|---|---|---|
| Total advances | $16, 650. 00 | $17, 683. 00 | $17, 433. 00 |
| Amounts recovered | 7, 306. 45 | 8, 212. 02 | 8, 043. 65 |
| Net advances | 9, 343. 55 | 9, 470. 98 | 9, 389. 35 |

After incorporation Culley advanced $846.73; Blair, $850; and McInnis $236.42. The books of the partnership carried all the advances made by the partners in accounts headed "Investment," and after incorporation these same accounts were maintained with the notation "Paid In Surplus" added. Several of the amounts advanced by Culley, Blair, and McInnis in 1945 were designated as loans. It is evident that when the equal partners incorporated a partnership business, and their capital accounts in the partnership are nearly equal and all the assets of the partnership are transferred to the corporation, the contribution of each partner is entered as a capital contribution. If the partners had made advances to the partnership, these advances have merely enhanced the partnership interest of each, and they have now been contributed to the capital of the corporation. We have seen that the sums advanced by the incorporators to the corporation were not too disproportionate. No notes or other evidences of indebtedness were issued to Culley, Blair, and McInnis for these various advances either by the partnership or by Colonial. It is evident to us, from a comparison of the initial investment by the parties with the subsequent scope of the real estate operations that the venture was inadequately capitalized. Frequent borrowing, in addition to the advances made, was necessary. The books themselves, while not conclusive on this point, regarded the advances as an investment. Nor can we find, from all the evidence and the testimony of the parties, that the advances were made with any expectation of repayment. Rather, all indications point to an intent to place the amounts advanced at the risk of the business. We agree with the respondent that the amounts advanced were capital contributions and that the losses suffered by Culley, Blair, and McInnis in 1950, upon the sale of their stock in the corporation, were long-term capital losses.

We are somewhat at a loss to understand petitioner Culley's claim as to the advancements made to King & Company, Inc. He claimed no loss deductions with respect to transactions with this corporation in his 1948 return. In addition to the $5,000 which Culley paid for stock in the corporation, Culley advanced $3,509.95 to the corporation during the years 1946, 1947, and 1948. This sum was all repaid either

before liquidation or by assets transferred to Culley at the time of liquidation. Culley admits this and states in his brief that his contention now is "that the loss from King & Company in the sum of Five Thousand ($5,000.00) Dollars was a loss on stock, deductible in full as stock held in Petitioner's trade or business." He states that he is not claiming "this Five Thousand ($5,000.00) Dollars is a bad debt loss."

The loss is nothing more than a loss from worthless stock which, under section 23 (g), is allowed as a capital loss. There is no merit to Culley's suggestion on brief that he is entitled to an ordinary loss because the stock was somehow held in a corporation which he calls his "trade or business."

A similar contention is made throughout petitioner's brief that the stock held in these various enterprises was held in a trade or business and that the losses due to this worthless stock are deductible as ordinary losses under section 23 (e) (2). There is no merit to this argument. Losses from worthless stock are deductible only under section 23 (g). The cases cited in support of this proposition are not in point.

3. The last issue concerns the nature of the gain realized by Culley from the sale of 41 residential lots in the years 1948 through 1951. Petitioner reported the gain from the sale of these lots as long-term capital gain. Respondent argues that the lots in question were property held by Culley for sale to customers in the ordinary course of his trade or business and that the gain from such sales is taxable as ordinary income. The question is one of fact. *D. L. Phillips*, 24 T. C. 435. In dealing with this question we have recognized several useful tests, such as frequency of sales, the purpose for which the property was acquired, the activity of the taxpayer or his agent in connection with the real estate sales, the nature and extent of the taxpayer's business, and the extent of improvements made to the property sold. No single test is decisive. *Walter R. Crabtree*, 20 T. C. 841, 846. During the period 1946 through 1951 Culley sold 797 residential lots, either individually or as a partner in two separate real estate partnerships. The 41 lots in dispute came from at least 10 different tracts of land: The Meadowridge Subdivision (7 lots); the Choctaw Park tract (8); the Culley-Jones tract (1); the Crane tract (1); the Homestead parcel (9); the Culley-Blair tract (3); and miscellaneous parcels of land (12). During the years 1949 through 1951 Culley maintained a real estate office with his brother-in-law, R. J. Arnold, who was involved in many of the sales here in question. Culley made improvements of various kinds on these tracts amounting to approximately $4,000. No distinction was made on the books and records of Culley in the various properties held by him. It is true that one can be in the real estate business with certain properties, and at the same time hold other properties for investment. But we cannot say that is the situation here.

We can discover no attempt by Culley to segregate his investment property from the rest. It also appears that the tracts here in question and those held by the real estate partnerships were in the same general area. Culley stresses the fact that the lots in question were, for the most part, sold by metes and bounds rather than by formally subdivided lots. We are more impressed, however, by the frequency of the sales made by Culley, in spite of the formal subdivision of the property. It bears out the desirability of the properties owned by Culley, near the outskirts of an expanding city. This desirability of the property also explains the lack of advertising. *C. E. Mauldin*, 16 T. C. 698, affd. 195 F. 2d 714. Some of the lots in question were distributed to Culley from his real estate partnership and then sold by him individually. It is true that not all the evidence is one way. However, after examining the record as a whole we must conclude that the 41 lots here in dispute were held by Culley for sale in the ordinary course of his trade or business and that the gains realized from such sales are taxable as ordinary income.

*Decisions will be entered under Rule 50.*