James J. Brahms v. Commissioner.
Brahms v. Commissioner
Docket No. 4492-62.
United States Tax Court
T.C. Memo 1964-238; 1964 Tax Ct. Memo LEXIS 99; 23 T.C.M. (CCH) 1426; T.C.M. (RIA) 64238; September 10, 1964
Julius I. Fox, 1707 H St., Washington, D.C., for the petitioner. George K. Dunham, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioner's Federal income tax for the years 1956, 1957, and 1959 in the respective amounts of $1,705.26, $2,516.64, and $2,951.95, and an overassessment for the year 1960 in the amount of $495.18. The only issue presented for our decision is whether petitioner is entitled to a business had debt deduction in the amount of $32,723.67 for the year 1959, which would entitle him to a net *100 operating loss carryback deductions for the years 1956 and 1957. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner is a single individual residing in Washington, D.C. He filed his Federal income tax returns for the years 1956, 1957, 1959, and 1960 with the district director of internal revenue at Baltimore, Maryland. Petitioner has been in the Washington, D.C., area since May 1, 1942. Since that time and up to the present time he has earned his living as an owner, operator, and president of various corporations engaged in the restaurant and bar business. Petitioner's first restaurant venture was in a corporation operating what was known as Olmstead's Restaurant. It was a wellknown restaurant located in downtown Washington. Prior to 1955 it was a successful business. Approximately 10 years ago, however, the dinner business in restaurants in the downtown Washington, D.C., area began to fall off. The luncheon business at Olmstead's was not sufficient to carry all the expenses of that restaurant. Olmstead's lost money and eventually was adjudicated a bankrupt and *101 thereafter went out of business. Petitioner personally lost $28,000 as a result of the failure of this enterprise. Prior to Olmstead's going out of business, petitioner foresaw that its future prospects were not good. He decided to invest in small restaurants and bars which he planned to develop into successful enterprises. It was his intention upon the establishment of a restaurant and bar to hire a manager for it so that he could retire from the active management of the businesses himself. At this time petitioner was approximately 55 years old. Petitioner hoped to be able to retire sometime in the future by living on the income which would accrue to him as the owner of several restaurants and bars. Pursuant to his plan, petitioner opened the Bourbon Room in Washington, D.C., in 1953. Petitioner reported salaries or salaries and commissions on his returns for the years 1956, 1957, 1959, and 1960 received from the Bourbon Room. At the present time the Bourbon Room is operated by a manager employed by petitioner. Petitioner next purchased a small restaurant and bar in southeast Washington, D.C., known as the Tune Inn. In this venture petitioner owned 90 percent of the outstanding *102 stock, and it was operated by a manager hired by him. Although this restaurant was a good business and paid petitioner a salary or a salary and commission, petitioner sold it in 1960 because it was located in a rough neighborhood and often the scene of rowdyism and fighting. It was not the style of restaurant and bar with which petitioner wished to be associated. Petitioner reported the gain on the sale of the Tune Inn on his 1960 return as long-term capital gain. Petitioner also acquired the stock of a corporation operating a restaurant and bar located at Mt. Pleasant and Lamont Streets in Washington, D.C., known as Headquarters. Petitioner owns all of the outstanding stock in this restaurant corporation and it has paid him a salary or salary and commissions. At the present time petitioner's principal source of income is from Headquarters, which pays him a salary of $450 per month. Petitioner's returns for the years 1959 and 1960 reflect income from salaries and commissions received from Headquarters in the total amounts of $5,894.50 and $6,300, respectively. In 1960 petitioner acquired 50 percent of the stock of a corporation which operates a restaurant in Georgetown, D.C., known *103 as Tivoli which paid him a salary. The remaining 50 percent of the outstanding stock of this corporation was owned by another individual who operated the restaurant. Sometime subsequent to 1960 this individual decided to retire. Since petitioner could not operate the restaurant himself he sold his stock interest in Tivoli. At the present time Tivoli is still in operation. Recently petitioner formed a corporation which opened a new restaurant on P Street, N. W., Washington, D.C., known as the Fireplace. Petitioner owns all of the stock of the corporation operating this restaurant which he pledged as security for loans made to obtain the money needed to open the restaurant. At the present time the Fireplace is doing well and petitioner expects that its earnings will be sufficient to repay the advances petitioner made in order to open the restaurant. Petitioner is not paid any salary by the Fireplace, but he takes his meals there. In 1958 petitioner purchased all of the stock of F & W. Inc. (sometimes hereinafter referred to as F & W), a Washington, D.C., corporation engaged in operating a restaurant and bar known as the Gas Light Room. Advances made by petitioner to F & W and claimed *104 by him to be business bad debts are the subject of the instant case. Petitioner made two payments to the sellers of the F & W stock. The first was made on February 17, 1958, in the amount of $2,500, and the second on February 24, 1958, in the amount of $5,626.80. On the books of F & W the purchase price was allocated by the petitioner as follows: Capital Stock
$1,000.00
Loan Payable
7,126.80
F & W was originally incorporated in November 1957 by two persons unrelated to petitioner. From the time of its incorporation until the time the stock in the corporation was purchased by petitioner, the corporation operated at a net loss of $7,566.62. After the purchase of the stock in F & W by petitioner, it continued to operate at a loss. Petitioner made advances for the period from the purchase of the stock until April 1959, when petitioner sold the stock of F & W. All of the funds advanced to F & W were from petitioner's own funds or from amounts which he borrowed from Olmstead's, when it was still in operation, from Tune Inn, and from his relatives. The books of F & W show loans from the petitioner in the total amount of $32,979.82, received during the period from *105 March 1958 through June 1959. [1] Of this amount approximately $3,000 was spent by petitioner during the first 2 months in which he owned the stock in F & W in converting the restaurant from a delicatessen into the Gas Light Room, a restaurant and bar furnished with antiques. The remaining amount was used to pay the ordinary operating expenses of the Gas Light Room and the bills it owed to its suppliers of food. Most of these expenses were paid immediately prior to the time when petitioner sold his stock in F & W. There were no notes given by the corporation covering the advances, no collateral to secure the advances, no interest paid on the advances, and no set time for repayment of the advances made. Only $256.15 of the total advances to F & W was repaid to petitioner. In April 1959 petitioner sold the stock of F & W to a third party for $2,500. This purchaser and several other subsequent purchasers failed to operate the Gas Light Room successfully. On his 1959 return petitioner reported a capital gain *106 in the amount of $1,500, representing the difference between the sale price and the amount of cost he had allocated to capital stock when he acquired F & W's stock. Petitioner also claimed in his 1959 return, as a business bad debt, the sum of $32,723.67, reprsenting the amount of the advances he made to F & W less repayments shown on the books of F & W. Petitioner also claimed a net operating loss carryback for the years 1956 and 1957, based upon the bad debt deduction claimed in his 1959 return. Respondent tentatively allowed petitioner overpayments for the years 1956 and 1957 in the respective amounts of $1,705.26 and $2,516.64. In the statutory notice of deficiency respondent disallowed the claimed bad debt deduction in 1959 and net operating loss carryback deductions in 1956 and 1957 and in lieu thereof determined that petitioner sustained a capital loss in the amount of $31,347.30 in the year 1959, of which $1,000 was allowed as a deduction in that year, and the balance was treated as a capital loss carryover to 1960. Respondent determined an overassessment in tax by petitioner in the amount of $495.18 for the year 1960 based upon a carryover of the capital loss determined *107 for the year 1959. Petitioner filed a claim for refund on April 13, 1964. Petitioner was not engaged in a regular course of promoting corporations for a fee or a commission. The loans in question were not necessary to keep petitioner's job nor were they otherwise proximately related to maintaining petitioner's trade or business as a corporate officer or employee. Opinion KERN, Judge: The only issue presented for our decision is whether petitioner is entitled to a business bad debt deduction in the amount of $32,723.67 for the year 1959, which would entitle him to a net operating loss deduction for 1959 and net operating loss carryback deductions for the years 1956 and 1957. Petitioner contends that the "advances" to F & W, which are in issue, were loans made "to protect and to hold on to his only source of ordinary income * * *." Petitioner further contends that his activities in the restaurant and bar business constitute the carrying on of a trade or business so that his loss with respect to F & W is deductible as a business bad debt within the meaning of section 166 [2] of the Internal Revenue Code of 1954. Petitioner relies on Trent v. Commissioner, 291 F. 2d 669, *108 reversing 34 T.C. 910; Giblin v. Commissioner, 227 F. 2d 692, reversing a Memorandum Opinion of this Court, and he argues that the case of Whipple v. Commissioner, 373 U.S. 193, is distinguishable.
*109 Respondent's position is that the advances in issue are to be treated as a contribution by petitioner to the capital of his whollyowned corporation, or as a nonbusiness bad debt within the meaning of section 166(d) of the Internal Revenue Code of 1954. In either case petitioner's loss would be taken into account as a capital loss for the year 1959 [3] and a short-term capital loss carryover to 1960, as determined by respondent in the notice of deficiency. We have grave doubts as to whether the advances made by petitioner to his whollyowned corporation under the circumstances here present constituted indebtedness rather than contributions to equity capital. See Gooding Amusement Co., 23 T.C. 408, affd. 236 F. 2d 159, certiorari denied 352 U.S. 1031; Emanuel N. (Manny) Kolkey, 27 T.C. 37, affd. 254 F. 2d 51; Lewis L. Culley, 29 T.C. 1076, 1088; J. A. Maurer, Inc., 30 T.C. 1273, 1290; *110 Wilbur Security Co., 31 T.C. 938, 948, affd. 279 F. 2d 657; and Estate of Dominick F. Pachella, 37 T.C. 347, 351, affd. 310 F. 2d 815. However, we need not decide this question since it is our opinion that even on the assumption that the advances constituted bona fide loans, as petitioner contends, they nevertheless constituted nonbusiness bad debts deductible only as short-term capital losses. Section 166(d) defines a nonbusiness bad debt as "other than - (A) a debt created or acquired (as the case may be) in connection with a taxpayer's trade or business; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business * * *." It is well settled that the business of a corporation is not the business of its stockholders or officers. Burnet v. Clark, 287 U.S. 410; Dalton v. Bowers, 287 U.S. 404. Petitioner cannot, therefore, and does not claim that he individually was so engaged in the restaurant and bar business as to entitle him to deduct the advances in issue as business bad debts. Petitioner contends that he was engaged in the "business of seeking out business *111 opportunities in the restaurant and bar business and promoting, organizing and financing them," and that his purpose in "acquiring the stock of the various corporations was to create sources of ordinary income." In Whipple v. Commissioner, supra, the question presented was whether the taxpayer's activities in connection with several corporations in which he held controlling interests could be characterized as a trade or business in order to permit a debt owed by one of the corporations to him to be treated as a business rather than a nonbusiness bad debt. The taxpayer's income consisted of income from interest, rentals, and salaries from his several corporations, although no such income was received from the corporation, the debt from which to the taxpayer became worthless. The Supreme Court disallowed the claimed business bad debt deduction to the taxpayer. In so holding, the Court said at pages 202 and 203: Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an *112 investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. Even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business. If full-time service to one corporation does not alone amount to a trade or business, which it does not, it is difficult to understand how the same service to many corporations would suffice. To be sure, the presence of more than one corporation might lend support to a finding that the taxpayer was engaged in a regular course of *113 promoting corporations for a fee or commission, see Ballantine, Corporations (rev. ed. 1946), 102, or for a profit on their sale, see Giblin v. Commissioner, 227 F. 2d 692 (C.A. 5th Cir.), but in such cases there is compensation other than the normal investor's return, income received directly for his own services rather than indirectly through the corporate enterprise, and the principles of Burnet, Dalton, du Pont and Higgins are therefore not offended. On the other hand, since the Tax Court found, and the petitioner does not dispute, that there was no intention here of developing the corporations as going businesses for sale to customers in the ordinary course, the case before us inexorably rests upon the claim that one who actively engages in serving his own corporations for the purpose of creating future income through those enterprises is in a trade or business. That argument is untenable in light of Burnet, Dalton, du Pont and Higgins, and we reject it. Absent substantial additional evidence, furnishing management and other services to corporations for a reward not different from that flowing to an investor in those corporations is not a trade or business under § *114 23(k)(4). We are, therefore, fully in agreement with this aspect of the decision below. [Footnotes omitted.] There is no evidence in the record that petitioner acquired various corporations engaged in the restaurant and bar business in order to sell them at a profit. Indeed, the record indicates otherwise. The Olmstead restaurant was not sold but was disposed of in a bankruptcy proceeding following the failure of that restaurant's business due to a fall off of the dinner business in the downtown Washington, D.C., area. The Tune Inn was sold because it was in a bad neighborhood and because petitioner did not wish to be associated with a restaurant and bar which was frequently the scene of rowdyism and fighting. The Tivoli was reluctantly sold by petitioner when his co-owner decided to retire and petitioner decided that he could not manage that restaurant and bar by himself. F & W was sold by petitioner after it suffered considerable losses and it was clear that petitioner could not make it a successful operation. Petitioner testified that he hoped that the restaurants which he presently owns, Headquarters, Bourbon Room, and Fireplace, would be successful and provide him with an *115 income for his retirement. It is clear that petitioner has so intention of selling these businesses for profit. It is also noteworthy that the gains on the sale of F & W and the Tune Inn were reported by petitioner on his return as long-term capital gains and not as ordinary income which would be a promoter's gain. All of the foregoing persuades us that petitioner was not engaged in the business of promoting restaurant and bar corporations to earn a profit on their sale. Accordingly, Giblin v. Commissioner, supra, upon which petitioner relies and in which case the taxpayer was permitted to deduct as a business bad debt a debt owed to him by a corporation which he promoted is not apposite. Petitioner, relying on Trent v. Commissioner, supra, finally contends that he was "in the trade or business of rendering executive services for pay" and that his advances to F & W were for the purpose of enabling it (the corporation) to continue the business and to pay him a salary. In Trent v. Commissioner, supra, the Court of Appeals held that loans made by the taxpayer therein to the corporation which employed him were necessary to keep his job and therefore *116 were deductible as business bad debts when they became worthless. In Whipple v. Commissioner, supra, the Supreme Court neither approved nor disapproved the Trent case, but noted that it would be inapplicable where there is no proof that the loan giving rise to the claimed business bad debt was necessary to keep the employee's job or was otherwise proximately related to performing or maintaining the taxpayer's trade or business as an employee. In our opinion the facts in the instant case are clearly distinguishable from those in the Trent case, and cause the disposition of this case to be governed by the rationale of the Whipple case. See Eugene H. Rietzke, 40 T.C. 443. It is our conclusion that petitioner's advances here were not proximately related to any trade or business in which he was engaged, and therefore we agree with respondent's alternative contention that these advances, if they were to be considered as loans, constituted nonbusiness bad debts. Decision will be entered for the respondent. Footnotes
1. Apparently petitioner advanced money to F & W after the time when petitioner sold his stock in F & W in order that the corporation could pay its debts to its creditors.↩
2. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(b) Amount of Deduction. - For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. * * *
(d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a taxpayer's trade or business; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. * * *↩
3. Since petitioner incurred no short-term capital gains in 1959 his tax liabilities for the years before us will be the same if the loss were treated either as a long-term capital loss or as a nonbusiness bad debt.↩