Thomas W. and Mary E. Nevin v. Commissioner.
Nevin v. Commissioner
Docket No. 92562.
United States Tax Court
T.C. Memo 1965-53; 1965 Tax Ct. Memo LEXIS 277; 24 T.C.M. (CCH) 294; T.C.M. (RIA) 65053; March 15, 1965
*277 Petitioner, a real estate dealer, together with a group of coventurers acquired several adjacent tracts of land, together with water stock and rights. They immediately resold the land. Subsequently, the contract for resale was partially rescinded and petitioner and his coventurers reacquired some of the tracts. Within the following 18 months 193 of the 208 acres reacquired were sold off or optioned in seven separate transactions. Two of these sales were to controlled conduits which immediately resold individual lots on a lot-by-lot basis. Petitioner engaged in no advertising or other active solicitation, but did subdivide most of the land and installed some improvements. The water stock and water rights were sold in separate transactions. Held: 1. Four of the sales of land and sales of water rights and stock held to be sales of properties which were not capital assets. Intent to hold them for sale to customers in ordinary course of business had not changed subsequent to original acquisition with that intent. 2. Sales of two parcels out of unplatted, unimproved raw land together with certain water stock also sold, held to be sales of capital assets. Intent upon acquisition to *278 hold property for sale to customers changed so that it was held for investment at time of saleo Gene W. Reardon and Julie M. Reardon, 2150 First National Bank Bldg., Denver, Colo., for the petitioners. Leo K. O'Brien, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined deficiencies in income tax against petitioners as follows: Year
Deficiency
1951
$10,640.48
1952
4,989.02
1953
12,247.26
1954
4,789.28
1955
5,031.33
Some of the adjustments set forth in the statutory notice of deficiency were not contested by petitioners or were conceded prior to trial. The only *279 issue remaining for decision is whether the gains from sales of certain parcels of real estate are to be taxed as ordinary income or as capital gain. More specifically we must determine whether the parcels sold were property held by the taxpayers primarily for sale to customers in the ordinary course of their trade or business. [1]
Findings of Fact Petitioners, husband and wife with residence in Denver, Colorado, filed joint Federal income tax returns for the taxable years 1951 through 1955 with the district director of internal revenue (or his predecessor, the collector of internal revenue) for the district of Colorado. Thomas W. Nevin is hereinafter referred to as "petitioner." Some of the facts were stipulated and are incorporated herein by reference. Petitioner was admitted to the bar in Colorado in 1940, and has been an attorney since that time. In addition he has been in the real estate and home construction business since the early 1950's. After his return from military service in 1944, he practiced law in Denver and became an officer in the American Legion. He served as assistant *280 attorney general for Colorado from 1948 to 1950. In connection with his American Legion activities petitioner became interested in 1946 in a tract of 140 acres of land in southwest Denver which the Federal Government sold to a group of veterans that year. Petitioner at that time believed that the city of Denver would grow in the direction of this property and that its value would probably increase dramatically. In 1950, this tract was still unimproved raw land and was owned by Colorado National Bank as trustee for the group of veterans. Hereinafter this land will be referred to in terms of three numbered parcels, to wit: Tract 1 (40 acres), Tract 6 (40 acres) and Tract 7 (60 acres). [2]
During or subsequent to 1946 petitioner also became interested in several other tracts of land all adjoining the 140 acres held by Colorado National Bank in southwest Denver. These tracts *281 were as follows: Tract 2
40 acres owned by Mandel and
Gordon.
Tract 3
40 acres owned by R. J. Casey
as trustee for a veterans' group.
Tract 4
40 acres owned by R. J. Casey
as trustee for a veterans' group.
Tract 5
68.88 acres owned by G. E.
Castiller.
In early 1950 petitioner and some associates organized Nevin Homes, Inc., to construct and sell prefabricated homes in an area in North Denver. Petitioner was president of Nevin Homes, Inc., and owned 25 percent of its stock. The remaining stockholders were Frederick Kal, a Denver lawyer, Margaret Coffey, petitioner's sister, and Victor Lee Coffey, petitioner's brother-in-law. This corporation was dissolved and liquidated in 1952. After having been interested in the southwest Denver land since 1946, and believing it ideal for development, petitioner (backed financially by others as hereinafter described) in February and March of 1950 took the following steps toward acquisition of all of Tracts 1 through 7. Tracts 1, 6 and 7 - Petitioner, together with his sister and brother-in-law, the Coffeys, [3] offered to purchase the 140 acres from the Colorado National Bank, trustee for a veterans' group (but *282 no agreement was made at this time). Tract 2 - Petitioner, representing himself and Frederick Kal, secured a purchase option from Mandel and Gordon. Tracts 3 and 4 - Petitioner representing himself, the Coffeys and Frederick Kal, [4] contracted to purchase the entire 40 acres of each tract (plus water rights) from R. J. Casey, trustee. Tract 5 - Petitioner, representing the Kal Group, contracted to purchase the full 68.88 acres from G. E. Castiller. The above-mentioned contract for purchase of Tracts 3 and 4 contained the following pertinent language: AND WHEREAS, the Purchaser desires said tract for the purpose of erecting thereon three-bedroom homes of standard construction for sale to the general public at a unit price between *283 eight (8) and ten (10) thousand dollars * * *
10. The purchaser agrees that he will offer for sale to the members of the Veterans Real Estate Debelopment [Development] Association the first twenty (20) homes erected by him on the described tract. * * * On May 8, 1950, petitioner conveyed his option to purchase Tract 2 to Nevin Homes, Inc., and on the same day the option was exercised and title to the full 40 acres was conveyed by Mandel and Gordon to Nevin Homes, Inc. In September or October of 1950, petitioner learned that a group of California builders, hereinafter referred to as "the Artcraft Group," might be interested in all of this land. In November petitioner began negotiating with the Artcraft Group for the sale of Tracts 1 through 7. In December, 1950, and early January, 1951, while negotiations were being carried on with the Artcraft Group for the sale of all the property, petitioner took the final steps toward acquiring title to Tracts 1, and 3 through 7, together with certain water rights and stock. On December 7 an agent of petitioner obtained an option to purchase all of Tract 5. [5] This option was exercised and petitioner took title (as trustee for the *284 Kal Group) on January 11, 1951. The Nevin Group, which had offered to purchase Tracts 1, 6 and 7 in March, 1950, now found itself in need of more capital to finance the purchase. To obtain this capital the Nevin Group invited Frederick Kal, M. J. Baum, Jr., and Albert and Robert Hayutin to participate for a 10 percent undivided interest each. On December 14, 1950, this enlarged group (hereinafter referred to as "the Baum Group") acquired title to Tracts 1, 6 and 7 in the name of petitioner as trustee. Each member of the Nevin Group (including petitioner) had an undivided 20 percent interest in the Baum Group property. On December 30, 1950, petitioner took title to Tracts 3 and 4 as trustee for the Kal Group. On or about January 6, 1951, petitioner, acting as trustee for the Baum and Kal Groups and as president of Nevin Homes, Inc., sold or optioned all of Tracts 1 through 7 to the Artcraft Group. The tax consequences of this transaction are not in question. The Artcraft Group drew up an integrated master plan for the entire *285 7 tracts, which laid out streets and individual lots. Artcraft commenced the building of homes on Tracts 1, 2 and 4 shortly after the January 6, 1951, transaction. During the course of the year 1951 the Artcraft Group found itself unable to carry out the entire development plan for this southwest Denver project. Hence, on October 31, 1951, the Artcraft Group reconveyed Tracts 3 [6] and 5 to petitioner as trustee for the Kal Group and Tracts 6 and 7 to petitioner as trustee for the Baum Group. At the end of February, 1952, the Baum Group was dissolved and the Nevin Group bought out the 40 percent interest of the other members. Thus, as of that date, and during the subsequent period when all of the sales here in question took place, petitioner owned an undivided one-third interest (as a member of the Nevin Group) in Tracts 6 and 7 and an undivided one-fourth interest (as a member of the Kal Group) in Tracts 3 and 5, along with the same fractional interests in various water rights and water stock owned by these two groups. After petitioner and his associates regained these tracts from the Artcraft Group they *286 received a few unsolicited offers to purchase, but (prior to the transactions described below) these were refused because the offered prices were too low. In late 1951 and early 1952 a series of preliminary plat maps subdividing the various tracts into streets and individual lots, etc., was drafted by Harman and O'Donnell, Denver planning consultants, at petitioner's request. On December 6, 1951, a plat map [*] Tract 3 and part of Tract 5 was completed designating the platted tracts as "Mar-Lee Manor No. 3." On February 13, [*] a plat map of Tract 6 was completed designating the platted tract as "Mar-Lee Manor No. 3." [7] On March 7, 1952, a plat [*$ of 53 acres of Tract 7 was completed designating the platted tract as "Mar-Lee Manor No. 4." Meanwhile, in January, 1952, petitioner was approached by James C. Ely, a representative of Professional and Businessmen's Life Insurance Company (referred to as "PBMI"), who was seeking land for purchase by that company. An option contract was concluded in January or February, 1952, covering 21.1 acres of Tract 6 (Mar-Lee Manor No. 2) and individual lots *287 were deeded to PBMI at various times during 1952 and 1953 as the options were exercised on a lot-by-lot basis. Records of the City Engineer's office show that petitioner in January and March of 1953 applied for curb stakes for streets through land in Tract 6 which had been optioned in January of 1952 to PBMI. Petitioner realized $6,392.44 in 1952 and $14,150 in 1953 as his share of the gain from the sale to PBMI. He treated this gain as capital gain in his income tax returns for those years. On January 4, 1952, 6 acres of Tract 3 (Mar-Lee Manor No. 3) were sold by the Kal Group to Denver School District No. 1. Petitioner's share of the gain on this sale was $210.56 for 1952. He treated this gain as a capital gain in his 1952 income tax return. In 1952, petitioner and Kal organized Nevin Construction Company, a corporation. Nevin Construction was owned 50 percent by Kal and 50 percent by petitioner, and its corporate purpose was to acquire, own, develop, build, subdivide and plat land. The corporation is still operating in Denver and has been in the real estate business since its inception. The Nevin Group made the following sales of platted lots from Tract 6 (Mar-Lee Manor No. *288 2) to Nevin Construction: October 7, 1952
10 lots
April 14, 1953
20 lots
April 23, 1953
10 lots
Nevin Construction built homes on 13 of these lots and advertised them for sale, but they sold very slowly. Kal did not wish to continue building on the remainder of the lots since he felt the market was bad. However, petitioner wished to continue building, so in September and October, 1953, 17 lots were reconveyed by Nevin Construction to petitioner individually and 6 lots to the Nevin Group. Shortly thereafter petitioner individually constructed homes on the lots conveyed to him and sold the improved lots individually to the public. The Nevin Group sold the 6 lots reconveyed to it from Nevin Construction to a third party within 2 months after the reconveyance. None of the transactions described in this paragraph are at issue in this proceeding. On August 28, 1952, the plat map of Tract 7 (Mar-Lee Manor No. 4) was approved by the local authorities. On November 10, 1952, the Nevin Group deeded the entire platted area of Tract 7, consisting of 53 acres, to J. Olin Stevens. J. Olin Stevens was a certified public accountant who shared an office suite with petitioner, *289 Frederick Kal and others during the years in question and who prepared petitioner's 1951, 1952 and amended 1952 income tax returns. Stevens paid only $1,000 as a downpayment and made subsequent installment payments so that petitioner realized, as his share of the profit on the sale $6,958.57 in 1952, $14,299.80 in 1954, and $8,489.25 in 1955, all of which he reported as capital gain. Respondent has determined these gains to be ordinary income. At some time prior to November 28, 1952, petitioner began to negotiate with Morris Brothers Construction Company, which desired to purchase the 53 platted acres of Tract 7. On November 28, 1952, a contract for option of the 53 acres was entered into between J. Olin Stevens and Morris Brothers Construction Company. Representatives of Morris Brothers who negotiated this contract did all their negotiating with petitioner. They were never sure of Stevens' relationship in the transaction and one of them knew of Stevens "only by the fact the deed came back signed by him." After the sale to Morris Brothers the platted tract was changed in designation from "Mar-Lee Manor No. 4" to "Morbro Park" (Nos. 1 and 2). In the written contract of option to *290 Morris Brothers the optionor agreed to pay the cost of installing combination curb-gutter, sewer laterals and street blacktop. At least two of the contractors hired to install these improvements for Stevens were hired by petitioner and never met nor heard of J. Olin Stevens. At least one of them submitted his periodic bills to petitioner. Curb and gutter stakes were applied for at the City Engineer's office by petitioner. All of the bills relating to these improvements were paid by Stevens (or his attorney). The Nevin Group lent money to Stevens to accomplish this development. During 1952, the Nevin Group sold some of the water rights and water stock acquired with the purchases of the southwest Denver land here involved to Adolph Coors Brewing Company. Petitioner's share of the gain from these sales was $1,466.67 and $1,237.50, respectively. He reported these amounts as capital gains, but respondent has determined them to be ordinary income. The preliminary plat map of Tracts 3 and 5 (Mar-Lee Manor No. 3), which was drawn up on December 6, 1951, as previously found, supra, was given final approval by local authorities on January 14, 1953. On March 30, 1953, petitioner, for the *291 Kal Group, conveyed 72.99 acres of Tracts 3 and 5 (Mar-Lee Manor No. 3) to Nevin Construction Company. At trial petitioner testified, "It was sold by the Kal Group to Nevin Construction Company because I decided to subdivide it." For the purchase of the 72.99 acres, Nevin Construction Company signed a note and deed of trust in the aggregate amount of $224,250. Petitioner's share of the gain from this sale to Nevin Construction was $32,472.93 for 1953. He reported this amount as capital gain but respondent determined it to be ordinary income. One week after the sale to Nevin Construction, on April 6, 1953, Nevin Construction sold 21 lots and optioned 79 more out of the 72.99 acres of Mar-Lee Manor No. 3 just acquired from the Kal Group to Globe Land Company. Some time prior to May 21, 1953, petitioner concluded an agreement with K. C. Ensor, a Denver builder for the sale of 177 lots in Mar-Lee Manor No. 3. It was not until the contract was actually signed that Ensor learned that petitioner was acting in his capacity as president of Nevin Construction Company rather than individually and that Nevin Construction was the owner and seller of the lots. On or about January 4, 1954, petitioner, *292 acting for the Kal Group, sold to Burns Realty Company 7.46 acres of the unplatted portion of Tract 5 not previously sold to Nevin Construction, together with some of the Salisbury water stock. Petitioner's share of the gains on these transactions was $3,803.40. This amount was reported as capital gain in petitioner's 1954 return, but respondent determined it to be ordinary income. On or about April 18, 1955, 1.04 acres of the unplatted remaining property of the Kal Group was sold to Frederics Brothers Investment Company. Petitioner reported his share of the gain from this sale, in the amount of $1,066.34, as capital gain in his 1955 return, but respondent has determined it to be ordinary income. Petitioner's undivided interest in all of the property involved in this proceeding was held by him for sale to customers in the ordinary course of his business at the time of the sales here in dispute, with the exception of his interests in the unplatted land in Tract 5 and certain shares of Salisbury water stock which were held by him as investments at the time of the two sales thereof in 1954 and 1955. Opinion *293 Whether or not petitioner is entitled to treat the gains realized from the sales above described as capital gains depends upon whether or not the property sold was held by him primarily for sale to customers in the ordinary course of his trade or business. Section 1221, Internal Revenue Code of 1954; section 117(a)(1), Internal Revenue Code of 1939. As has been frequently stated, this ultimate issue is essentially a factual one dependent upon the precise facts of the particular case under consideration. D. L. Phillips, 24 T.C. 435 (1955), acq. 1956-1 C.B. 5. See also Curtis Co., 23 T.C. 740 (1955), and cases cited therein at page 750. Petitioner has endeavored to portray the transactions giving rise to the gains here in controversy in chiaroscuro. He paints himself as a man with financial foresight who correctly anticipated a great rise in real estate values in southwest Denver, bought several parcels of land in the area (along with a group of other joint venturers), held on to them as an investment for capital appreciation and later sold upon receiving several unsolicited offers at prices too "fabulous" to refuse. *294 He points out that he is a lawyer by profession and possesses no real estate dealer's license, that he engaged in no activity to promote sales of this land, that there was no advertising, no development, no improvements installed, and that sales were infrequent. Throughout the course of the trial petitioner was relentless in his efforts to exclude from the case any evidence concerning sales by him of property not located in Tracts 1 through 7, and resales of portions of Tracts 1 through 7 during the years in question by petitioner's vendees. All of the transactions dealt with in our Findings of Fact we deem relevant to the complete picture here, and despite petitioner's urgings, we cannot blind ourselves to the surrounding stars as we examine the moon. See Ehrman v. Commissioner, 120 F. 2d 607 (C.A. 9, 1941), affirming 41 B.T.A. 652, certiorari denied, 314 U.S. 668 (1941). On the other hand, respondent's approach to the portrait of this case adds the chromatic touches essential to a full understanding and evaluation of the particular sales here in dispute. Respondent points out that petitioner was engaged in active real estate trading and *295 dealing in the Denver area; that for petitioner the purchase and subsequent sales of Tracts 1 through 7 were basically an integrated project; that subdivision development was the basic approach; that the great majority of the land was platted before sale; and that all sales were to real estate customers in the ordinary course of business (even though some were made through an agent or a controlled corporation). We have no trouble whatsoever in finding that petitioner was engaged in the trade or business of buying, improving, and selling real estate. Petitioner conceded at trial that he was in the real estate business during the years in question. Even had he not so conceded we would have so found. The record is replete with evidence indicating virtually full-time activity in the real estate field, not only as an officer of two home building corporations but on his own or as a member of various groups or syndicates. He described his business in his 1953, 1954 and 1955 joint Federal income tax returns as builder-homes. Although his returns also stated that petitioner was a lawyer and he remained a lawyer throughout the period, his income from his legal practice was comparatively small *296 and but a fraction of his annual income from real estate transactions. Cf. The Queensboro Corporation, 46 B.T.A. 1216 (1942), affd. 134 F. 2d 942 (C.A. 2, 1943); Walter G. Morley, 8 T.C. 904 (1947). As the Court of Appeals stated in Friend v. Commissioner, 198 F. 2d 285 (C.A. 10, 1952), affirming a Memorandum Opinion of this Court, "* * * one may engage in two occupations. He may engage in the practice of law as a profession and at the same time hold property primarily for sale to customers in the ordinary course of the real estate business, within the meaning of section 117." We have omitted making specific findings of fact concerning petitioner's many real estate transactions unrelated to the sales here in question in order to avoid prolonging even further our already lengthy findings. Suffice it to say that the evidence of record leaves us without a shadow of doubt that petitioner was engaged in the real estate business throughout the period in question. Our finding that petitioner was in the real estate business does not conclude the case, however. Petitioner contends that even though he was in the real estate business, *297 the real estate and water rights here in question were never part of his "stock in trade," but were held purely as investments. It is well established that a dealer in real estate may occupy a dual role: he may be a dealer with reference to some of his properties, and an investor as to others. Eline Realty Co., 35 T.C. 1 (1960), citing Charles E. Mieg, 32 T.C. 1314, 1321 (1959); D. L. Phillips, supra; Walter R. Crabtree, 20 T.C. 841 (1953); Nelson A. Farry, 13 T.C. 8 (1949). One of the factors to be considered in determining whether a piece of property was held by a dealer only for investment is the intention and the circumstances under which the property was acquired. See Miller v. United States, 339 F. 2d 661 (Ct. Cl., 1964). However, it has become axiomatic that, while the purpose for the acquisition must be given consideration, intent is subject to change, and the ultimate question of decisive consequence is the *298 purpose for which the property is held at the time of sale. Friend v. Commissioner, supra; Joseph A. Harrah, 30 T.C. 1236 (1958); Eline Realty Co., supra, and cases therein cited. The evidence in the instant case makes it eminently clear that at least six of the seven tracts were not originally purchased for investment, but were purchased for subdivision or for immediate resale to the Artcraft Group. The contract for purchase of Tracts 3 and 4 clearly indicates in more than one paragraph not only an intention of the purchaser to develop the property with homes, but an obligation on his part to make a certain number of homes so built avalable to the seller. Petitioner did not acquire title to six of the seven tracts until after negotiations had been well under way for sale of all seven tracts to the Artcraft Group. In the case of Tract 5 petitioner did not even get title until five days after the sale to Artcraft. Petitioner tries to minimize the adverse implications of not taking title until after previously having negotiated a resale by pointing out that he in effect controlled the land prior to negotiations with Artcraft because he had *299 options to purchase. Petitioner stated on the witness stand, "Nobody gets title until you are ready to convey." Such a statement reveals an attitude that belies the investment motive. One who buys property for investment to hold on to with no immediate intention or prospects for resale would generally take title at the time of the purchase. It would be illogical for an investor, who presumably intends to hold the purchased property indefinitely, to wait until he sells it (a sale not anticipated at the time of prchase) before he takes title from his vendor. Petitioner's remark tends to indicate that his option was obtained with the intention of reconveying the land optioned, i.e., that investment was not the motive at the time the options were acquired. Although it appears clear that the seven tracts and water rights were not purchased originally for investment purposes, we must still inquire into the crucial question whether the portions sold which gave rise to the gains here in question were held as investment property thereafter and at the time of sale. It is possible that at some time subsequent to reacquisition of Tracts 3, 5, 6 and 7 from the Artcraft Group these tracts, or *300 portions of them, could have changed in status to "investment" property. See Loans and Service, Inc. v. United States, 193 F. Supp. 683 (N.D. Ohio, 1961), Ryman v. Tomlinson, an unreported case ( S.D. Fla., 1956, 51 A.F.T.R. 1283, Collin v. United States, 57 F. Supp. 217 (N.D. Ohio, 1944). Accord, Richards v. Commissioner, 81 F. 2d 369 (C.A. 9, 1936). We are convinced that the unplatted parcels sold to Burns Realty and to Frederics Brothers from Tract 5 and the Salisbury water stock also sold to Burns Realty with the parcel conveyed to Burns was investment property at the time of those transfers, the same having become "investment" property subsequent to the reacquisition from the Artcraft Group. However, all of the remainder of the property in Tracts 3, 5, 6 and 7 and the other water rights and water stock retained its character from the time of original acquisition until the time of sale: property held primarily for sale to customers in the ordinary course of petitioner's real estate business. [8]
*301 Sales of Land to PBMI, School District No. 1, Nevin Construction Company and J. O. Stevens, and Water Stock and Rights to Adolph Coors Brewing Company We deem it highly significant that all four of these sales of land were of acreage which had been subdivided and platted into streets, blocks, lots, etc. See Snell v. Commissioner, 97 F. 2d 891 (C.A. 5, 1938), affirming a Memorandum Opinion of this Court; DiLisio v. Vidal, 233 F. 2d 909 (C.A. 10, 1956). Most of the deeds for the sales in controversy are on a lot-by-lot basis. Cf. Lewis L. Culley, 29 T.C. 1076 (1958), acq. 1958-2 C.B. 4. Petitioner steadfastly contends that he and his coventurers did no developing or platting. This contention is contradicted by documentary and other evidence and as indicated by our Findings of Fact we just cannot believe it in the light of the entire record before us. Petitioner attempts to explain the facts that plats were completed prior to the sales, and that some of the final approved plats were filed in petitioner's name, by claiming that some of the platting was done by the City Planning Commission and not by him, and that the platting *302 done by him was done at the request and expense of his vendees. For example, he claims that the platting of Mar-Lee Manor No. 2 was done at the request of PBMI, which optioned 21.1 acres of that tract after negotitions which began in January, 1952. However, the fact remains that the tract was still owned by the Nevin Group when the platting was done. The contract with PBMI was an option contract under which PBMI could continually exercise its option on individual lots. Hence, the land had to be platted into individual lots before any sales could be made to PBMI under the option contract, and whether the firm which did the platting was hired and paid by PBMI or by petitioner is unimportant. The important fact is that the platting facilitated sales of the land on a lot-by-lot basis by the Nevin Group. Furthermore, if the platting was done at the instance and for the sole benefit of the purchaser why did the plat include the whole tract rather than just the portion which was sold to the purchaser? Petitioner's testimony that Tracts 3 and 5 (Mar-Lee Manor No. 3) were platted by the City Planning Commission was contradicted by the testimony of a representative of the City Engineer's Office *303 that the City Planning Commission does not plat property owned by private persons. This platting activity flies swiftly in the face of petitioner's argument that he just "sat on" the raw land and waited for its value to go up with no active intent to sell. There was considerable development activity in the area surrounding the petitioner's tracts when the land was reacquired in 1951. The platting of Tracts 3, 5, 6 and 7 shortly after their reacquisition from Artcraft cannot be viewed as motivated by any reason other than enhancing the immediate salability of the property in an area where development was flourishing and land suitable for development was in great demand. See Wood v. Commissioner, 276 F. 2d 586 (C.A. 5, 1960), affirming on this point a Memorandum Opinion of this Court; Charles E. Reithmeyer, 26 T.C. 804 (1956). Petitioner stresses the fact that neither he nor his coventurers did any advertising or solicitation of buyers. The buyers merely learned that petitioner held title to this land and they came to him seeking to purchase. While the absence of *304 activity aimed at soliciting purchasers is often indicative that the property is not held for sale to customers, see e.g. Frieda E. J. Farley, 7 T.C. 198 (1946), acq. 1946-2 C.B. 2, such absence of activity lends petitioner no support under the circumstances of the instant case. In light of the demand for subdivision property in the area, advertising was not necessary - even for an owner who may have intended to sell. It was a seller's market and buyers were actively seeking out sellers. Hence, it cannot be maintained in this case that the absence of solicitation indicates that the property was not held primarily for sale to customers. Lewis L. Culley, supra; C. E. Mauldin, 16 T.C. 698 (1951), affd. 195 F. 2d 714 (C.A. 10, 1952). While some purchase offers may have been refused, refusals were apparently not very numerous. In fact, of the approximately 208 acres reacquired from Artcraft on October 31, 1951, 193 acres had been sold in 7 separate transactions by April 23, 1953, less than a year and a half later. The first sale was negotiated within only three months after the reacquisition. Cf. Palos Verdes Corporation v. United States, 201 F. 2d 256 *305 (C.A. 9, 1952). The number of sales is increased even more if one is to consider that the great majority of the approximately 113 acres sold to Nevin Construction Company were resold by the corporation (whose operations were managed by petitioner) before the end of October, 1953, to at least 13 different purchasers. Petitioner claims that the Nevin and Kal Groups had no intent to sell and set no sales price on their land but that they received unsolicited offers at prices just too "fabulous" to pass up. These claims hardly coincide with the fact that few offers were refused and most of the land was disposed of within 1 1/2 years of acquition. There is no evidence that amounts offered to and accepted by petitioner were any more "fabulous" than the going market price for land in the area. [9] The petitioner was apparently ready and willing to sell whenever favorable offers were received. We do not deny that it is possible that land held for investment may undergo a dynamic increase in value - even within a year's time, and that a wise investor may choose to sell at the apex of this quick *306 rise in anticipation of a subsequent drop in value. Under such circumstances, the shortness of the time span involved does not make the land any the less a capital asset. However, when a rapid turnover occurs under the circumstances disclosed by the record here and the taxpayer is in the real estate business and originally acquired the property for resale, it stretches the imagination to conclude that the land was held for investment at time of sale. Unfortunately, for petitioner in this case, he bears the yoke of having to show that even though he was in the real estate business and the land in question was acquired for resale, the status of this land changed from business "inventory" to investment property between the date of acquisition and the date of sale. We cannot find that petitioner has shown this transformation of motive - especially in view of the fact that less than three months passed between the date of reacquisition of the land from Artcraft and the first negotiations for sale of part of it. Petitioner's quest for capital gain is still further impeded by his having engaged in the installation of improvements (curbs, gutters, etc.) with respect to some of the platted *307 property. The original contract for sale of 6 acres to Denver School District No. 1 provided that the vendor (Kal Group) would install a street to serve this property. [10]
The sale to J. O. Stevens and the option of the same tract by Stevens to Morris Brothers Construction Company 18 days later involved improvement work by petitioner. The evidence very strongly indicates that Stevens was merely a conduit through which the Nevin Group was able to sell lots on a lot-by-lot basis to Morris Brothers Construction Company. The option contract between Stevens and Morris Brothers was entered only 18 days after the sale by the Nevin Group to Stevens. Stevens paid only $1,000 down on the purchase price - the same amount paid by Morris Brothers to him as a deposit on the latter contract. Morris Brothers did all the negotiating for purchase of the 53 acres with petitioner and was *308 never sure of Stevens' relationship in the transaction. One officer of Morris Brothers knew of Stevens only by the fact that his name was on the deed. Under the November 28, 1952, option from Stevens to Morris Brothers, the optionor was obligated to install curb gutter, sewer laterals, and street blacktop. These improvements were installed by petitioner. Petitioner hired contractors and applied for curb stakes. Although bills were paid by Stevens, he was advanced funds to pay for the improvements by the Nevin Group. We cannot believe petitioner's self-serving argument that his activity in connection with the Morris Brothers option was merely as attorney for Stevens, and we conclude that Stevens was merely a conduit through which the Nevin Group was able to option the 53 acres and sell lots on a lot-by-lot basis as Morris Brothers exercised its options. See S. Nicholas Jacobs, 21 T.C. 165 (1953), affd. 224 F. 2d 412 (C.A. 9, 1955); Johnson v. United States, 188 F. Supp. 939 (N.D. Calif., 1960). See also Estate of M. A. Collins, 31 T.C. 238 (1958). The sale to PBMI also presumably involved development work by petitioner. Documents *309 from the City Engineer's office reveal that petitioner applied for curb stakes for streets running through and along the lots sold to PBMI. [11]
The sale of the 72.99 acre parcel to Nevin Construction Company was, by petitioner's own admission made because petitioner desired to subdivide it. Thus, at the time of sale by the Kal Group to Nevin Construction, petitioner's share of this 72.99 acres of Kal Group land was held by him for subdivision and sale to customers. Petitioner, citing Ralph E. Gordy, 36 T.C. 855 (1961), contends that subdivision, construction and sales of single lots to the public by a corporation are not to be imputed to the controlling officer of the corporation who merely sells to it the raw land which is used in this development activity. While this may be a correct general statement of the law, it is a round hole into which the square peg representing the facts in the instant *310 case does not fit. In the Gordy case, the taxpayer individually was not in the real estate business, but was merely an officer (and part owner) of several corporations which were in the real estate business. In the instant case, we have found that petitioner as an individual was in the real estate business. Nevin Construction Company was merely one entity through which part of this business was carried on. The evidence in fact tends strongly to indicate that the option of a substantial portion of the 72.99 acres by Nevin Construction to Globe Land Company just one week after the conveyance by the Kal Group to Nevin Construction was negotiated by petitioner prior to the sale to Nevin Construction. The reconveyance of lots by Nevin Construction to petitioner also indicates the relative insignificance of Nevin Construction as a separate entity. Nevin Construction was owned equally by petitioner and Kal. When Kal wished to discontinue building homes but petitioner wanted to go ahead, several blocks were merely deeded by the corporation back to petitioner individually, and he went ahead alone with the construction. The facts with regard to this sale to Nevin Construction are almost identical *311 to those in the case of Burgher v. Campbell, 244 F. 2d 863 (C.A. 5, 1957), in which the court stated, at page 864: We do, however, point to the fact that part of this land was sold to a wholly owned corporation a little over two years after it was acquired and was by it subdivided and sold to the public. Such action was consistent with a holding by the taxpayers for sale rather than for investment. The fact that it was sold in a raw state in a tract of 41 acres is not decisive. The question is whether it was held for sale at the time. Neither is it decisive that the customer to which it was sold was a wholly owned corporation. The fact that Mr. Burgher with all of his buying and selling history bought the land in 1945 and sold it in 1947 to a corporation controlled by him and which immediately subdivided and sold lots from it, is ample evidence on which the court could find that it was bought in 1945 for that purpose. There is the further fact that Mr. Burgher got back some of the lots himself and later sold them, admittedly in the ordinary course of his real estate business. The trial court was not required to accept the theory advanced by the taxpayer that this particular *312 property for these particular years was held for investment rather than for sale when it was actually sold so soon after its acquisition. * * * Cf. Walter H. Kaltreider, 28 T.C. 121 (1957), affd. 255 F. 2d 833 (C.A. 3, 1958): S. Nicholas Jacobs, supra. Based upon all of the above factors, we conclude that petitioner's undivided fractional interests in the land sold to PBMI, School District No. 1, Nevin Construction Company, and J. O. Stevens, and the water rights and stock sold to Adolph Coors Company were held by him for sale to customers in the ordinary course of his business, and that his gains from these sales must be treated as ordinary income. The respondent's determinations with respect to these transactions are sustained. Sales to Burns Realty Company and Frederics Brothers Investment Co. These two sales were of land out of the unplatted portion of Tract 5 and of some Salisbury water stock also transferred to Burns. After reacquisition from the Artcraft Group, petitioner engaged in no activity related to this portion. It was never platted and never advertised for sale. The two sales in question did not occur until several *313 months subsequent to the disposition in 1952 and 1953 of the greater portion of the land reacquired from the Artcraft Group in 1951. Despite the fact that the parcels sold to Burns Realty and Frederics Brothers Construction were also originally acquired for immediate resale, the petitioner's inactivity with respect to the unplatted land out of which these two parcels were sold (especially when contrasted with the great amount of activity devoted to the platted land) justifies the conclusion that at the time of these sales these particular tracts and the Salisbury water stock were properties then held for investment. Cf. Rev. Rul. 57-565, 1957-2 C.B. 546; Charles E. Mieg, supra; Eline Realty Co., supra. We conclude that petitioner has carried his burden with respect to these transactions to establish that these two parcels and the Salisbury water stock which was transferred with the Burns Tract were capital assets at the time of sale. The respondent's determinations with respect to these sales are not sustained. Decision will be entered under Rule 50. Footnotes
1. See sec. 117(a)(1), I.R.C. 1939; sec. 1221(1), I.R.C. 1954↩.
2. The breakdown and numbering system used to identify the parcels of land involved herein was established for convenience by one of the parties at trial. While we would prefer a somewhat clearer identification system, we have adopted the system used at trial and in both briefs in order to prevent confusion.↩
3. For convenience hereinafter the group consisting of petitioner, his sister, and his brother-in-law, will be referred to as "the Nevin Group." Petitioner had an undivided one-third interest in all property of the Nevin Group.↩
4. For convenience hereinafter the group made up of petitioner, the Coffeys and Frederick Kal, will be referred to as "the Kal Group." Petitioner had an undivided one-fourth interest in all property of the Kal Group.↩
5. The previously mentioned contract of March 1950, for purchase of Tract 5 had been abandoned because of failure of the seller to tender a clear title.↩
6. With the exception of 1.01 acres of one corner adjacent to Tract 2.↩
7. This designation was changed to "Mar-Lee Manor No. 2" on the final plat.↩
8. See also Coffey v. United States, an unreported case (D.C.Colo., 1963. 11 A.F.T.R. 2d 1559), aff'd 333 F. 2d 945↩ (C.A. 10, 1964) involving the income tax consequences of the same transactions to Victor Lee Coffey and Margaret H. Coffey.
9. One of the purchasers of land from petitioner testified that he paid "top-market" price.↩
10. This obligation was later dropped when an adjacent tract was sold by Nevin Construction Company to the School District a few years later. However, the mere presence of such a term in the original contract indicates that the Kal Group was not just a passive holder of raw land merely liquidating an investment.↩
11. We note that the application was made several months after the agreements between the Nevin Group and PBMI was concluded. This tends to indicate that the contract with PBMI (which was not introduced into evidence) required the vendor to install some improvements.↩